CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERI-
CA AND NEW JERSEY CHAMBER OF COMMERCE, PLAIN-
TIFFS-RESPONDENTS, v. STATE OF NEW JERSEY AND
JOHN J. DEGNAN, ATTORNEY GENERAL OF NEW JERSEY,
DEFENDANTS-APPELLANTS.

Argued December 14, 1981—Decided May 3, 1982.

134

136

*Robert E. Rochford*, Deputy Attorney General, argued the cause for appellants (*Judith A. Yaskin*, Acting Attorney General of New Jersey, attorney; *John DeCicco*, Assistant Attorney General, *Mr. Rochford* and *Emily L. Gosnell*, Deputy Attorney General, of counsel; *Emily L. Gosnell*, on the briefs).

*Vincent J. Apruzzese* argued the cause for respondents (*Apruzzese & McDermott*, attorneys; *Lawrence B. Kraus* and *Stephen A. Bokat*, members of the District of Columbia bar, of counsel; *Vincent J. Apruzzese* and *Francis A. Mastro*, on the brief).

*Dennis J. Alessi* submitted a brief on behalf of *amicus curiae* New Jersey State AFL–CIO (*Zazzali & Kroll*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This case concerns the validity of *N.J.S.A.* 34:13C–1 *et seq.*, commonly referred to as the *Strikebreakers Act.* This Act proscribes the importation, transportation or supplying of individuals for employment in this State for the purpose of interfering by force or violence with lawful employer/employee bargaining, or replacing employees who are lawfully on strike or locked out. The Act also forbids anyone not directly involved in the strike or lockout to recruit persons to replace such employees and prohibits employment agencies from knowingly referring applicants to an employer whose employees are then on strike or locked out.[1]

Plaintiffs, United States Chamber of Commerce and New Jersey Chamber of Commerce, filed a complaint in the Superior Court, seeking a declaratory judgment that the Act is unconstitutional. The principal basis for the challenge was that the regulatory scheme is preempted by federal labor law under the Supremacy Clause of the Federal Constitution, Art. VI, Clause 2. Plaintiffs also charged that the legislation violates the Due Process,[2] Equal Protection,[3] Commerce[4] and Privileges and Immunities Clauses[5] of the Federal Constitution, and the due

---

[1] Other sections of the Act, the constitutionality of which are not at issue here, prohibit the importation of out-of-state union pickets, *N.J.S.A.* 34:13C–4, make a violation of the Act a misdemeanor, *N.J.S.A.* 34:13C–5, and exempt common carriers from its provisions, *N.J.S.A.* 34:13C–6.

[2] *U.S.Const.*, Amend. XIV, § 1.

[3] *U.S.Const.*, Amend. XIV, § 1.

[4] *U.S.Const.*, Art. I, § 8, cl. 3.

[5] *U.S.Const.*, Art. IV, § 2, cl. 1.

process, equal protection and special legislation provisions of the New Jersey Constitution.[6] The Attorney General filed an answer that admitted that a substantial question existed regarding preemption and the Commerce Clause, but denied that the Strikebreakers Act violated any of the other constitutional provisions.

The parties entered into a stipulation in lieu of discovery. The stipulation provided that

(1) Pursuant to *N.J.S.A.* 34:13C–1 *et seq.*, various complaints have been issued in municipal courts, and some presentments have been made to various grand juries, but no determination of the constitutionality of *N.J.S.A.* 34:13C–1 *et seq.* has ever been undertaken by any court.

(2) The instant case is ripe for disposition by motions for summary judgment.

(3) For purposes only of a motion for summary judgment, plaintiffs United States Chamber of Commerce and New Jersey Chamber of Commerce have standing to challenge the constitutionality of *N.J.S.A.* 34:13C–1 *et seq.*

(4) The Attorney General has never issued any formal or informal opinion concerning the constitutionality of *N.J.S.A.* 34:13C–1 *et seq.*

No further evidence of these facts other than this stipulation need be offered.

Subsequently, plaintiffs moved for summary judgment. The trial court declared *N.J.S.A.* 34:13C–1(c), 34:13C–2 and 34:13C–3 [7] unconstitutional. The provisions were invalidated as being preempted by the Supremacy Clause as to those employers and employees covered by the National Labor Relations Act, 29 *U.S.C.* § 151 *et seq.* The court also declared that the same provisions were void in their entirety because they violated the Due Process and Equal Protection Clauses. The trial court found that *N.J.S.A.* 34:13C–1(a) and (b) withstood the constitutional attack.

The Attorney General appealed to the Appellate Division. The New Jersey AFL–CIO intervened as *amicus curiae.* Prior to the adjudication of the matter by the Appellate Division, we granted plaintiff's motion under *R.* 2:12–2(a) for direct certifica-

---

[6]These provisions are found in Art. I, ¶ 1 and Art. IV, § 7, ¶ 8 of the New Jersey Constitution.

[7]These provisions are reproduced *infra* at 149.

tion. The issues before us are whether the matter is properly before the Court and whether *N.J.S.A.* 34:13C–1(c), –2 and –3 are constitutional.[8]

## I

We turn first to whether the matter is properly before us. The Attorney General's answer questioned whether the plaintiffs were persons whose rights were adversely affected. However, he has not pressed that point upon the appeal and did not oppose plaintiffs' motion for direct certification because of the substantive importance of the issues. Nevertheless, we are compelled to comment on the matter because the proceedings could be viewed as a request for an advisory opinion.

The action was commenced under the Declaratory Judgments Act. That Act authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. A person whose rights or legal relations are affected by a statute may have the validity of that statute determined. *N.J.S.A.* 2A:16–53. To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit. *Young v. Byrne,* 144 *N.J.Super.* 10, 16 (Law Div. 1976). "The Uniform Declaratory Judgments Act cannot be used to decide or declare rights or status of parties upon a state of facts which are future, contingent and uncertain." *Lucky Calendar Co. v. Cohen,* 20 *N.J.* 451, 454 (1956) quoting *Tanner v. Boynton Lumber Co.,* 98 *N.J.Eq.* 85 (Ch.1925).

---

[8]The Attorney General contends that the only constitutional issues before us are the correctness of the trial court's determinations that the statutes violated the Supremacy, Equal Protection and Due Process Clauses. The trial court did not rule upon the other constitutional propositions advanced by the plaintiff. We are of the opinion that those propositions may also be considered. The judgment of a trial court may be upheld for reasons other than those relied upon below. Moreover, no determination adverse to the plaintiff was made on these other matters, so that a cross-appeal was not warranted.

■ Membership in the plaintiff organizations, which are non-profit tax exempt corporations, includes thousands of employers within the State. Criminal complaints for violating the Act have been filed against some of these employers. We believe the plaintiffs have standing, even though the harm may technically be not to them but to their constituencies. This holding is in keeping with the now well-established policy enunciated by Justice Jacobs in *Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y.*, 58 *N.J.* 98 (1971):

> Unlike the Federal Constitution, there is no express language in New Jersey's Constitution which confines the exercise of our judicial power to actual cases and controversies. *U.S.Const.* art. III, § 2; *N.J.Const.* art. VI, § 1. Nevertheless we will not render advisory opinions or function in the abstract (*New Jersey Turnpike Authority v. Parsons*, 3 *N.J.* 235, 240 (1949)) nor will we entertain proceedings by plaintiffs who are "mere intermeddlers" (*Baxter v. Baxter*, 43 *N.J.Eq.* 82, 86 (Ch.1887), aff'd, 44 *N.J.Eq.* 298 (E. & A. 1888), or are merely interlopers or strangers to the dispute (*Bergen County v. Port of New York Authority et al.*, 32 *N.J.* 303, 307, 318 (1960)). Without ever becoming enmeshed in the federal complexities and technicalities, we have appropriately confined litigation to those situations where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness. In the overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of "just and expeditious determinations of the ultimate merits." [*Id.* at 107–08]

*See also New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Commission*, 82 *N.J.* 57, 67–69 (1980); *Home Builders League of South Jersey, Inc. v. Tp. of Berlin*, 81 *N.J.* 127, 131–35 (1979).

## II

■ The Federal Constitution and federal laws are "the supreme Law of the Land" and "Judges in every State [are] bound thereby; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *U.S.Const.*, Art. VI, cl. 2. State laws that conflict or interfere with federal legislation must give way because of this constitutional provision, known as the Supremacy Clause. Determining when that conflict or interference exists is frequently a complex and intricate matter, particularly when unraveling the unstated intent of Congress.

The ultimate question is always whether Congress intended to preempt the subject matter of the state legislation. *See Int'l Longshoremen's Ass'n v. Waterfront Comm'n*, 85 *N.J.* 606, 612 (1981). When the doctrine of preemption is applied, the underlying policies of the Supremacy Clause—elimination of inconsistent state policies and ensurance that the states will be bound together with certain goals—are served. *See generally The Federalist* No. 15 (A. Hamilton).

■ Preemption analysis begins with identifying the subject matter of the state law and determining whether there is a federal law operative in that field. *Hines v. Davidowitz*, 312 *U.S.* 52, 64–68, 61 *S.Ct.* 399, 402–404, 85 *L.Ed.* 581, 587 (1941). The focus then shifts to the federal regulation. The Supreme Court has developed some general guidelines that are useful in uncovering Congressional intent. Does the federal statute expressly or by necessary implication indicate exclusivity? *See Gibbons v. Ogden*, 22 *U.S.* (9 Wheat) 1, 6 *L.Ed.* 23 (1824). Is the federal scheme so pervasive that it precludes coexistence of state regulation? *See San Diego Bldg. Trades v. Garmon*, 359 *U.S.* 236, 246, 79 *S.Ct.* 773, 780, 3 *L.Ed.2d* 775, 784 (1959). Does the state program stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"? *See Hines v. Davidowitz, supra*, 312 *U.S.* at 67–68, 61 *S.Ct.* at 404, 85 *L.Ed.* at 587. An affirmative answer to any one of these questions would establish preemption and the state policy must yield insofar as it frustrates or blocks federal policy. *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 *U.S.* 132, 142, 83 *S.Ct.* 1210, 1217, 10 *L.Ed.2d* 248, 256–57 (1963).

In the labor-management field, Congress has not expressly provided for exclusive federal jurisdiction.[9] *See Weber v. An-*

---

[9]Congress has exercised its authority over labor relations in three major statutes: the National Labor Relations Act of 1935 (NLRA), 29 *U.S.C.A.* §§ 151–166; the Labor Management Relations Act of 1947 (LMRA), 29 *U.S.C.A.* §§ 141–144, 151–167, 171, 186; and the Labor-Management Reporting and Disclosure Act of 1959 (LMDRA), 29 *U.S.C.A.* §§ 141, 153, 158–160,

heuser-Busch, Inc., 348 *U.S.* 468, 480–81, 75 *S.Ct.* 480, 487–488, 99 *L.Ed.* 546, 557–58. The federal statute directly involved here, the National Labor Relations Act, involves, at least facially, less than complete regulation. The question then is whether the state activity interferes with the federal scheme delineated in the Labor Act. This in turn necessitates an analysis of federal statutory law as interpreted by the federal courts. *See generally* Cox, "Labor Law Preemption Revisited," 85 *Harv.L.Rev.* 1337 (1972).

■ The National Labor Relations Act generally grants employees the right to form and join labor organizations and to bargain collectively through representatives of their own choosing. NLRA § 7, 29 *U.S.C.A.* § 157. These enumerated employee activities are protected against employer interference. Preemption safeguards these rights against intrusion by the states. *International Union, UAW v. O'Brien*, 339 *U.S.* 454, 457, 70 *S.Ct.* 781, 782, 94 *L.Ed.* 978, 983 (1950). *See also Street Employees Division 1287 v. Missouri*, 374 *U.S.* 74, 83 *S.Ct.* 1657, 10 *L.Ed.*2d 763 (1963); *Amalgamated Ass'n v. Wisconsin Emp. Rel. Bd.*, 340 *U.S.* 383, 71 *S.Ct.* 359, 95 *L.Ed.* 364 (1951). Moreover, states may not provide for relief predicated on the same rights set forth in section 7. So, even concurrent or supplementary state legislative action is not permissible. *Garner v. Teamsters Local 776*, 346 *U.S.* 485, 491, 74 *S.Ct.* 161, 166, 98 *L.Ed.* 228, 239–40 (1953).

■ The Labor Act also delineates activities, designated as unfair labor practices, in which neither an employer nor a labor organization may lawfully engage. NLRA § 8, 29 *U.S.C.A.*

164, 187. The LMRA amended and incorporated the NLRA. In light of the focus of this opinion, references to the labor legislation will be cited to the NLRA. The LMDRA, while amending certain sections of the LMRA, is primarily concerned with the regulation of internal union affairs rather than union-management relations generally covered in the prior acts.

§ 158.[10] Here again, state statutes may not duplicate or conflict with the federal provisions. Thus, a state was held to be powerless to grant employees remedies for an employer's conduct that was an unfair labor practice under federal law. *Plankinton Packing Co. v. Wisconsin Employment Relations Bd.,* 338 *U.S.* 953, 70 *S.Ct.* 491, 94 *L.Ed.* 588 (1950), rev'g mem. 255 *Wis.* 285, 38 *N.W.2d* 688 (1949). *See also Garner v. Teamsters Local 776, supra,* 346 *U.S.* at 490–91, 74 *S.Ct.* at 165–66, 98 *L.Ed.* at 239–40 (1953) (union's picketing in violation of section 8(b)(2) could not be basis for state action).

A third category involves situations where the activities do not fall clearly within section 7 or section 8, but are "arguably" subject to either section. In *San Diego Building Trades Council v. Garmon, supra,* the Supreme Court held that only the NLRB could make the initial determination whether the activity was subject to regulation under the federal law. It ruled that states were preempted from acting on matters even "arguably" subject to the Act. The Court then went on to state:

> In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction. . . . The governing consideration is that to allow the states to control activities that are potentially subject to federal regulations involves too great a danger of conflict with national labor policy. [359 *U.S.* at 246, 79 *S.Ct.* at 780, 3 *L.Ed.2d* at 784]

There also fell within the sweep of this pronouncement those situations where the NLRB had by regulation declined to exercise jurisdiction, in particular by exempting employers whose

---

[10]Section 8(a) provides it is an unfair labor practice for an employer to interfere with the rights guaranteed in section 7, to establish "company unions," to discriminate on account of employees' union activity or on account of their testifying before the agency charged with implementing the statute, and to refuse to bargain collectively with the duly established employee representatives.

Section 8(b) states it is an unfair labor practice for a labor organization or its agents to engage in secondary boycotts, jurisdictional strikes over work assignments, and strikes to force an employer to discharge an employee on account of his union affiliation, or lack of it.

gross revenues were less than a specified amount. Congress closed this gap by amending the Act to provide:

(2) Nothing in this Act shall be deemed to prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction. [NLRA § 14(c)(2), 29 *U.S.C.A.* § 164(c)(2))

A fourth preemptive classification involves areas that are not covered specifically or arguably by sections 7 and 8 of the Act, but that arise out of the central underlying purpose of those provisions. This purpose was referred to in *Amalgamated Association of Street Employees v. Lockridge,* 403 *U.S.* 274, 286, 91 *S.Ct.* 1909, 1917, 79 *L.Ed.*2d 473, 482 (1971), where the Supreme Court observed that a reason for the Act was the need "to provide an informal and coherent basis for ... delicately structuring the balance of power among competing forces so as to further the common good." The significance of this structuring in relation to preemption was epitomized in *Teamsters Local 20 v. Morton,* 377 *U.S.* 252, 84 *S.Ct.* 1253, 12 *L.Ed.*2d 280 (1964). A strike occurred during collective bargaining between the union and the employer. The union engaged in secondary activities involving the employer's customers and suppliers violative of state, but not federal, law. The Supreme Court reasoned that the federal scheme set up a balance of power between labor and management; that Congress, by not proscribing the union's conduct, permitted the union to retain that weapon in its arsenal; and that the state had no right to upset the balance. The substantive state law had to yield to this federal policy.

The *Morton* rationale was confirmed some twelve years later in *Machinists v. Wisconsin Emp. Rel. Comm'n,* 427 *U.S.* 132, 96 *S.Ct.* 2548, 49 *L.Ed.*2d 396 (1976). The union imposed economic pressure on the employer during negotiations of a collective bargaining agreement by having the employees refuse to work overtime. The employer sought to enjoin the union and its members from refusing to work those hours. The Court denied the relief. While finding that the employer had the right to employ economic pressure on the union, it held that the employ-

er's bargaining position could not be strengthened by the state assisting the employer in removing the union's economic pressure. The federal act had left an area for the free play of the contending economic forces and states were preempted from interfering with that federal regulatory scheme.

Justice Brennan, writing on behalf of the Court, observed:

Although many of our past decisions concerning conduct left by Congress to the free play of economic forces address the question in the context of union and employee activities, self help is of course also the prerogative of the employer because he, too, may properly employ economic weapons Congress meant to be unregulable. [*Id.* at 147, 96 *S.Ct.* at 2556, 49 *L.Ed.2d* at 407]

*See American Ship Bldg. Co. v. NLRB,* 380 *U.S.* 300, 317, 85 *S.Ct.* 955, 966, 13 *L.Ed.2d* 855, 866–67 (1965) (resort to economic measures is the right of the employer as well as the employee).

■ The preemption rule in *Morton* and *Machinists* is not without its limitations. Some matters of special local concern that are not directed at the labor-management relationship may properly be the subject of state regulation. Legislation that addresses state interests that are "deeply rooted in local feeling and responsibility" and that peripherally touch federal labor law withstand preemption. *Sears, Roebuck & Co. v. Carpenters,* 436 *U.S.* 180, 194–95, 98 *S.Ct.* 1745, 1756, 56 *L.Ed.2d* 209, 224 (1978); *San Diego Building Trades Council v. Garmon, supra,* 359 *U.S.* at 243–44, 79 *S.Ct.* at 778–79, 3 *L.Ed.2d* at 782. This limitation is generally restricted to traditional state actions in areas such as torts or prevention of violence. *E.g., Farmer v. United Brotherhood of Carpenters,* 430 *U.S.* 290, 97 *S.Ct.* 1056, 51 *L.Ed. 2d* 338 (1977) (allowed state court actions for intentional infliction of emotional distress); *Linn v. Plant Guard Workers,* 383 *U.S.* 53, 86 *S.Ct.* 657, 15 *L.Ed.2d* 582 (1966) (permitted action for libel); *Youngdahl v. Rainfair,* 355 *U.S.* 131, 78 *S.Ct.* 206, 2 *L.Ed. 2d* 151 (1957) (allowed picketers to be enjoined from threatening or provoking violence); *United Construction Workers v. Laburnum Construction Corp.,* 347 *U.S.* 656, 74 *S.Ct.* 833, 98 *L.Ed.* 1025 (1954) (permitted tortious suit for damages based upon loss of construction jobs as a result of union violence and threats of

violence); *Allen-Bradley Local # 1111 v. Wisconsin Emp. Rel. Bd.*, 315 *U.S.* 740, 62 *S.Ct.* 820, 86 *L.Ed.* 1154 (1942) (found state laws enjoining disruptive, violent, or coercive picketing not preempted by the NLRA).

Determining when the local interest is paramount may be difficult. The case of *New York Tel. Co. v. New York Labor Dept.*, 440 *U.S.* 519, 99 *S.Ct.* 1328, 59 *L.Ed.2d* 553 (1979), is illustrative of the problem. An attack was directed against a New York statute that included strikers among those eligible for unemployment benefits. The Supreme Court held the state act was not preempted. A plurality of three members of the Court reasoned that the state unemployment benefits program did not constitute an attempt to regulate or prohibit private conduct in the labor-management field, but involved a state program for the distribution of benefits to certain members of the public. *Id.* at 545–46, 99 *S.Ct.* at 1343–44, 59 *L.Ed.2d* at 572. Justice Brennan concurred because the legislative history of the Social Security Act, pursuant to which the state unemployment act had been adopted, indicated a federal intent to sanction such unemployment insurance laws. *Id.* at 546–47, 99 *S.Ct.* at 1344, 59 *L.Ed.2d* at 572–73. Justice Blackmun joined by Justice Marshall stated in a concurring opinion that preemption exists unless there is evidence of a congressional intent to tolerate the state practice. They found evidence of such congressional intent. *Id.* at 549–50, 99 *S.Ct.* at 1345–46, 59 *L.Ed.2d* at 574–75. The dissent, written by Justice Powell, joined by the Chief Justice and Justice Stewart, adopted the position that the fair balance of bargaining power that had been established by the federal statute was significantly altered when the state provided for benefits to striking employees. It also found that Congress did not intend the Social Security Act to alter the policy in the NLRA. *Id.* at 560–61, 99 *S.Ct.* at 1351–52, 59 *L.Ed.2d* at 581–82.

All the justices agreed that an act that affects the economic balance between labor and management and that is focused upon labor relations rather than peculiarly local interests is presumptively invalid in the absence of a clear legislative intent

to the contrary. *Amicus* New Jersey State AFL–CIO argues that the broad preemption category that *Machinists* applied had been whittled away in *New York Telephone Co.* Our analysis of the legal principle enunciated in *New York Telephone* satisfies us that the principle of preemption remains the same, though its application to a particular set of facts may lead to different results as evidenced by the majority and dissenting opinions in *New York Telephone.*

The statute involved in this case is directly related to the balance of economic power between labor and management. The right to hire replacements for striking workers is an economic weapon that can play a significant role in the collective bargaining process. If available, it strengthens the employer's position. If unavailable, the union's bargaining position would be enhanced. The irresistible conclusion under the *Morton* rationale is that the federal framework structuring the economic balance between employer and union has preempted state action that would interfere with, modify, or alter an employer's right to hire replacements for striking employees.

It is also significant that it is the settled rule in federal labor law that an employer may hire replacements for those who are striking. The Supreme Court in *NLRB v. Mackay Radio & Tel. Co.*, 304 *U.S.* 333, 58 *S.Ct.* 904, 82 *L.Ed.* 138 (1938), stated that an employer has "the right to protect and continue his business by supplying places left vacant by strikers" and that nothing in the federal statute deprived the employer of this right. *Id.* at 345, 58 *S.Ct.* at 911, 82 *L.Ed.* at 1390. *See Philip Carey Mfg. Co. v. NLRB*, 331 *F.2d* 720, 725 (6th Cir.), *cert.* den., 379 *U.S.* 888, 85 *S.Ct.* 159, 13 *L.Ed.2d* 92 (1964). *Cf. NLRB v. Fleetwood Trailer Co.*, 389 *U.S.* 375, 88 *S.Ct.* 543, 19 *L.Ed.2d* 614 (1967); *Laidlaw Corp. v. NLRB*, 414 *F.2d* 99 (7th Cir. 1969) (recognizing right of employer to replace economic strikers).

It might be noted that Congress has forbidden the transportation of any person employed for the purpose of obstructing or interfering by force or threats with peaceful picketing. 18

*U.S.C.A.* § 1231. No contention has been advanced in this litigation that this statute has preempted the field and we do not address that issue. However, it can be argued that Congress by forbidding only transportation of persons to interfere with peaceful picketing chose to permit transportation of persons to replace strikers.

The trial court held that *N.J.S.A.* 34:13C–1(c), –2 and –3 were preempted insofar as employers and employees were subject to and covered by the Labor-Management Relations Act. Those statutes read as follows:

It shall be unlawful for any person, firm, partnership or corporation to import from outside the boundaries of the State of New Jersey, or to transport within the State of New Jersey, or to supply from without the State any person or persons for the purpose of being or becoming employed with an object of:
. . . .
(c) replacing in employment any employees of any employer who are lawfully on strike or who have been locked out. [*N.J.S.A.* 34:13C–1]

It shall be unlawful for any person, firm or corporation, not directly involved in a strike or lockout, to recruit any person or persons for employment, or to secure or offer to secure for any person or persons any employment, when the purpose of such recruiting, securing or offering to secure employment, is to have such persons take the place in employment of employees in an industry where a strike or a lockout exists. [*N.J.S.A.* 34:13C–2]

Employment agents licensed as such under the laws of the State of New Jersey, and the New Jersey Employment Service shall not be affected by sections 1 or 2 of this act, but no such employment agent, and no person acting on behalf of the New Jersey Employment Service shall knowingly refer an applicant for employment to an employer any of whose employees are then engaged in a strike or have been locked out. [*N.J.S.A.* 34:13C–3; footnote omitted]

Since employers have the right under the federal law to hire replacement employees in the event of a strike, these statutory provisions contravene the labor-management economic balance established by the federal Act. The state Act is directed specifically at labor-management relations, rather than at a general matter of local concern, such as trespass or nuisance. Although some provisions relate to the activities of persons other than the employer, it is clear that those persons would be acting on behalf of, or in support of, the employer's attempt to obtain new employees. In short, those sections of the Act are aimed at all

those who would aid an employer in the recruitment of replacements. This regulation directly affects management practices and is aimed at their control. The methods an employer sees fit to use in obtaining replacements are part and parcel of his federal right. The primary effect could be to make replacement virtually impossible for some employers, such as those who had to obtain highly skilled workers of which there was an insufficient number available in a single area. Thus, the employer's utilization of others to recruit or transport prospective employees to the place of business cannot be inhibited by the state law. This limitation would apply as well to employment agencies licensed by the State of New Jersey. *See Illinois v. Fed. Tool & Plastics*, 62 *Ill.*2d 549, 344 *N.E.*2d 1 (Sup.Ct.1975) (holding Illinois statute which prohibited employer from advertising for replacement workers to be invalid because of federal preemption).

The *amicus* contends that insofar as the New Jersey Public Employment Service is concerned, federal law recognizes that states are not preempted from enacting legislation restricting public employment offices from participating in the employment of replacement employees. This contention is premised on the Wagner-Peyser Act under which the federal government, to develop a national system of employment offices, agreed to assist state employment services in those jurisdictions that accept the provisions of the federal act. 29 *U.S.C.A.* § 49c. New Jersey joined the federal scheme. *N.J.S.A.* 43:21–12. The federal law authorizes the Secretary of Labor to "provide for the giving of notice of strikes or lockouts to applicants before they are referred to employment," 29 *U.S.C.A.* § 49j, and to promulgate rules and regulations necessary to carry out that provision. The Secretary adopted a regulation prohibiting State employment agencies from making a job referral "which will aid directly or indirectly in the filling of a job opening which is vacant because the former occupant is on strike, or is being locked out in the course of a labor dispute, or the filling of which is otherwise an issue in a labor dispute involving a work stoppage." 20 *CFR* § 653.8(a) (1981) (replacing 20 *CFR* § 602.2 which

was substantially the same). State statutes that carry out the federal law governing state employment agencies conform with the obligations imposed by the federal statute and are obviously effective.[11] Thus, since the operation of the New Jersey Employment Service must conform with the federal plan and presumably does so, the notion that there is preemption cannot stand.

Alternatively, the Attorney General and *amicus* attempt to save the statute from constitutional infirmity by narrowing its scope. They argue that the statute should be interpreted to apply only to situations where violence or potential violence is involved. Such a construction would limit the Act to matters "deeply rooted in local concerns" and therefore not be subject to preemption. Whether such "judicial surgery" should be utilized depends upon whether the Legislature would have wanted the

---

[11]The Employment Service Manual of the N.J. Division of Employment Services of the Department of Labor and Industry provides:

*Withholding Referrals in Case of Labor Dispute.* The local office makes no referral which will aid directly or indirectly in filling a job: (a) which is vacant because the former occupant is in strike; or (b) the filling of which is an issue in a labor dispute.

Chapter 193, P.L. 1960, Laws of New Jersey, provides that "no person acting on behalf of the New Jersey State Employment Service shall knowingly refer an applicant for employment to an employer, any of whose employees are then engaged in a strike or have been locked out." (On February 15, 1961, Governor Robert B. Meyner signed into law Assembly Bill No. 548 (1960), which became effective immediately and is now Chapter 193, of the Laws of 1960.)

The new law makes it a misdemeanor for any person acting on behalf of Employment Service to knowingly refer an applicant for employment to an employer of one or more persons, if any of the employees of the employer are then engaged in a strike or have been locked out.

Under the new law, personnel can make no referrals to positions that are vacant because of a labor dispute (strike or lockout); nor can personnel make referrals to fill other vacancies of an employer involved in a labor dispute, whether the labor dispute exists in this State or in another State. The word "employer" means an employing unit with one or more persons in employment.

[Part II, N.J. 1654, 3/8/76]

statute to survive. Justice Handler in *N.J. Chamber of Commerce v. N.J. Elec. Law Enforce. Comm'n*, 82 *N.J.* 57 (1980), explained the judicial problem:

> In appropriate cases, a court has the power to engage in "judicial surgery" or the narrow construction of a statute to free it from constitutional doubt or defect. See, *e.g.*, *Broadrick v. Oklahoma, supra*, 413 *U.S.* [601] at 613, 617–618, 93 *S.Ct.* [2908] at 2916, 2918–2919, 37 *L.Ed.2d* [830] at 840–841, 843–844; *United States v. Harriss, supra*, 347 *U.S.* [612] at 618, 74 *S.Ct.* [808] at 812, 98 *L.Ed.* [989] at 996–997; *Borough of Collingswood v. Ringgold*, 66 *N.J.* 350, 357 (1975), app. dism. 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.2d* 826 (1976); *State v. De Santis*, 65 *N.J.* 462, 472–473 (1974), *State v. Profaci*, 56 *N.J.* 346, 349–350 (1970); *Schmoll v. Creecy*, 54 *N.J.* 194, 202–205 (1969); *Woodhouse v. Woodhouse*, 17 *N.J.* 409, 416 (1955). *Cf. State v. Rosenfeld*, 62 *N.J.* 594, 603 (1973) (in absence of ascertainable legislative preference among alternative statutory interpretations, judicial surgery is inappropriate). Although judicial surgery can be practiced in constitutional adjudications, the occasion for its application is not easy to identify or explain. In *Schmoll v. Creecy, supra*, this Court framed the question that should properly be answered where a statute apparently contains a fatal constitutional defect: Would the Legislature want the statute to survive? The Court indicated that such an
>
>> inquiry cannot turn simply upon whether the statute, if adjusted to the constitutional demand, will cover more or less than its terms purport to cover. Although cases may be found which seem to speak in such mechanical terms, we think the sounder course is to consider what is involved and to decide from the sense of the situation whether the Legislature would want the statute to succumb. [54 *N.J.* at 202].
>
> [82 *N.J.* at 75]

We cannot tell from the legislative history whether the Legislature would have enacted so limited a bill. Moreover, judicial dissection of the statute into components of violence and nonviolence could have an untoward mischievous result. This becomes evident when it is realized that as the situation became more volatile, the employer's right to employ replacements would vanish. Thus employees would be encouraged to cause disruptions on the picket line and thereby prevent the employer from hiring replacements. The end result is inconsistent with a supposed legislative purpose to prevent violence. Furthermore, the Legislature was fully cognizant that picket line violence and breaches of peace are subject to judicial restraint and punishment under generally applicable local law. Lastly, the violence is usually provoked by pickets attempting to bar entrance to the

struck plant, and it would seem likely that violence would occur irrespective of how the replacements were hired. Under these circumstances we cannot say with any assurance that the Legislature would have desired the statute to survive in that truncated fashion. We are satisfied that the federal law has preempted the state's rights to affect the economic balance between labor and management and that such preemption extends to those labor-management relationships governed by the NLRA.

The NLRA excludes certain employee classifications, such as agricultural laborers, domestic servants,[12] independent contractors, or individuals employed as supervisors. NLRA § 2(3), 29 *U.S.C.A.* § 152(3). In addition, the NLRB has the authority to decline jurisdiction over labor disputes where the effect on commerce is not considered to be sufficiently substantial. NLRA § 14(c)(1), 29 *U.S.C.A.* § 164(c)(1). As indicated previously, when the Board does not accept jurisdiction, the states may then act, but are limited to such labor disputes. NLRA § 14(c)(2), 29 *U.S.C.A.* § 164(c)(2).[13] *See Cooper v. Nutley Sun Printing Co.*, 36 *N.J.* 189 (1961). A noted labor scholar has summarized the situation in this manner:

> Of course, the concerns that underlie the doctrine of preemption are normally called into play only with regard to activities of persons who are within the coverage of the federal Labor Act and the jurisdiction of the NLRB. State law will then generally operate freely when regulating governmental employees or agricultural workers, who are excluded from the Act by sections 2(2) and 2(3) respectively. [R. Gorman, *Basic Text on Labor Law*, 769 (1976)]

The question remains whether the Legislature would have adopted its act limited in scope to those employee-employer

---

[12]Department of Labor and Industry statistics reveal that as of 1974 there were 20,400 agricultural workers and 29,100 domestics employed in New Jersey. "Occupational Employment Projections—185—for New Jersey and Its Major Labor Areas," New Jersey Department of Labor and Industry (October 1978).

[13]It had been held prior to the enactment of this provision in 1959 that the refusal to exercise jurisdiction did not give rise to a state power of regulation. *Guss v. Utah Labor Relations Bd.*, 353 *U.S.* 1, 77 *S.Ct.* 598, 1 *L.Ed.*2d 601 (1957).

situations not covered by the NLRA. The indications are that it would have. The Legislature had passed the present law (A.548), which was characterized as a "strong" pro-labor bill, but Governor Meyner had deferred signing it while the Senate was considering a milder bill (A.368), already passed by the Assembly. When he finally signed the more stringent act, the Governor's message to the Senate related that it still had the choice of enacting A.368, which contained a provision repealing A.548. While recognizing that the Senate had unanimously passed A.548, the Governor maintained that "the substitute was a far more reasonably and balanced bill." Despite this, the Senate refused to report the compromise measure for a vote. It was noted at the time that A.548 was part of a national AFL–CIO forty-state campaign seeking, in effect, to amend the federal labor relations law. The New Jersey Act most completely met the union's demand and its primary purpose was to adjust the balance of power between management and labor. Comment, "Anti-Strikebreaking Legislation," 115 *U.Pa.L.Rev.* 190 (1966); Note, "Replacements," 77 *Harv.L.Rev.* 377 (1963). Under these circumstances the likelihood is that the Legislature would have acted even in the more limited sphere.

As in *State v. Zito*, 54 *N.J.* 206, 218 (1969), we read requirements into the statute, namely, its applicability to non-covered NLRA employees and employers, "since the Legislature would likely want the statute to remain to the extent that it may" and we discern "no impediment to such judicial surgery as will bring the statute within the [Federal] Constitution." This situation may be differentiated from the earlier attempt to read the requirement of violence into the statute because the proposed surgery, as discussed earlier, would lead to a counterproductive result, *i.e.* more violence. Moreover, the objective of preventing and controlling violence has been addressed in other legislation. *See N.J.S.A.* 2C:33 *et seq.* and 2C:39 *et seq.* Together, these complications precluded judicial surgery there.

## III

The inquiry does not end at this point, for the plaintiff urges, and indeed the trial court found, that *N.J.S.A.* 34:13C–1(c), 13C–2 and 13C–3, though limited to non-NLRA covered employees, violated other provisions of the Federal and State Constitutions. Although the trial court's judgment did not specify the constitutional provisions, it appears from the transcript of the oral argument that it relied upon the due process and equal protection provisions in the Fifth and Fourteenth Amendments of the United States Constitution and Article I, paragraph 1 of the State Constitution.

### (a) Due Process

Due Process analysis calls for a determination of whether the state legislative purpose and the means employed are constitutionally permissible. The legislation must bear a rational relationship to a constitutionally permissible objective. *Ferguson v. Skrupa*, 372 *U.S.* 726, 732, 83 *S.Ct.* 1028, 1032, 10 *L.Ed.* 2d 93, 98 (1963).

Permissibility of the state legislation rests upon the state's police power. The state may, in the exercise of its police power, take such action as in its judgment is appropriate to promote and protect the public health, safety and welfare. This is a broad power. *DeCanas v. Bica*, 424 *U.S.* 351, 356, 96 *S.Ct.* 933, 936, 47 *L.Ed.2d* 43, 49 (1976) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.") The public interest in the resolution of labor disputes lies not only in the prevention of violence that may occur when individuals are hired to replace strikers, but also, and, indeed perhaps more so, in the expeditious solution of the problem. Thus, the Legislature's desire to modify the power balance between management and labor by limiting the employer's ability to hire replacements could supplement a belief that in that manner a fairer and more prompt adjustment of the differences could be attained.

Whether this reasoning is sound or the result wise is not within our judicial province. Justice Douglas in *Williamson v. Lee Optical Co.*, 348 *U.S.* 483, 75 *S.Ct.* 461, 99 *L.Ed.* 563 (1955), pronounced:

> The day is gone when the Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. [*Id.* at 488, 75 *S.Ct.* at 464, 99 *L.Ed.* at 572]

We have frequently noted our deference to the Legislature's wisdom, *see King v. So. Jersey Nat'l Bank*, 66 *N.J.* 161, 178–79 (1974), and do so again. Moreover, judicial intervention founded on substantive due process is not appropriate in "the area of economic and social welfare" for economic, social and philosophical disputes are for legislative rather than judicial resolution. *Dandridge v. Williams*, 397 *U.S.* 471, 487, 90 *S.Ct.* 1153, 1162, 25 *L.Ed.*2d 491, 503 (1970).

The plaintiff also focuses its due process argument on the assumptions that an employer has an unbridled and absolute right to contract with whomever he desires and that the prospective replacement has a right to earn a living through gainful employment. These absolutist assumptions have long since been rejected. The public interest in advancing the public health and welfare has been reflected in a myriad of legislation placing limitations upon the employment relationship. Hours of employment, conditions in the place of employment and minimum rates of pay are a few areas in which legislation has been enacted. *See United States v. Darby*, 312 *U.S.* 100, 61 *S.Ct.* 451, 85 *L.Ed.* 609 (1941) (upholding Fair Labor Standards Act). Furthermore, the statute in question does not act as an absolute bar to hiring. Under section 13C–1 an employer is prohibited from importing or supplying from outside New Jersey, or transporting within the State any person to replace an employee who is out on strike or has been locked out. It does not prohibit an employer from directly hiring individuals to replace striking or locked out employees. Sections 13C–2 and –3 relate only to those "not directly involved" in the strike or lockout, thus excluding the employer, and to employment agencies. Although

the inability to use employment agencies or third persons to recruit prospective employees may well affect the employer's hiring capability, such capability is not foreclosed. Likewise, an individual's right to employment may also be subject to legitimate restrictions. Here no individual is prevented from obtaining employment because of the statutory strictures.

All these limitations are incidental to the State's exercise of its police power. The legislative purposes in the exercise of its police power justify the infringement of the employer's and the individual's right to enter into contracts freely. The legislative objectives have been accomplished in a conceivably rational manner and the statute therefore satisfies the Due Process Clause. *Ferguson v. Skrupa, supra,* 372 *U.S.* at 732, 83 *S.Ct.* at 1032, 10 *L.Ed.*2d at 98. The same reasons that satisfied federal substantive due process requirements are equally applicable to meet those required under Article I, par. 1 of the State Constitution.[14] The individual rights expressed therein may be affected when there is proper public justification. This is such a case.

(b) Equal Protection

■ Plaintiffs contend that the statute violates the Equal Protection Clauses in the Federal and State Constitutions by not treating all employers and employees identically. Equal protection claims under the Fourteenth Amendment must be tested by federal guidelines. The United States Supreme Court's equal protection analysis encompasses a three-tier approach. *Matthews v. Atlantic City,* 84 *N.J.* 153 (1980). This may be summarized as follows: When the legislation regulates "fundamental rights" or "suspect classes," it will be subject to "strict scrutiny" and the state will be required to demonstrate (1) that a compel-

---

[14]Article I, par. 1, provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

ling need justifies the legislation and (2) that no less restrictive alternative will accomplish that state objective. *See Graham v. Richardson,* 403 *U.S.* 365, 91 *S.Ct.* 1848, 29 *L.Ed.*2d 534 (1971). At the other end of the spectrum is the rational basis test. Under this standard of review a court inquires first whether there is a conceivable legitimate state objective and second whether the classification selected is rationally related to that objective. *Id.* at 371–72, 91 *S.Ct.* at 1851–52, 29 *L.Ed.*2d at 541; *Dandridge v. Williams, supra,* 397 *U.S.* at 486–87, 90 *S.Ct.* at 1162, 25 *L.Ed.*2d at 502–03. In considering the second, categories need not be formed with mathematical nicety and legislatures may attack a problem one step at a time. *Williamson v. Lee Optical, supra,* 348 *U.S.* at 488–89, 75 *S.Ct.* at 464–65, 99 *L.Ed.* at 572–73 (1955).

The third approach, articulated by the Supreme Court in *Craig v. Boren,* 429 *U.S.* 190, 97 *S.Ct.* 451, 50 *L.Ed.*2d 397 (1976), is an intermediate one. The appropriateness of intermediate scrutiny depends upon the character of the legislative classification or the nature of the rights affected by the statutory scheme. It may be that a "semi-suspect" classification, like gender, is implicated or that a fundamental right is being substantially affected in an indirect manner. *E.g., Bullock v. Carter,* 405 *U.S.* 134, 144, 92 *S.Ct.* 849, 856, 31 *L.Ed.*2d 92, 100 (1972). In these circumstances the legislative classification must serve important governmental objectives and must be substantially related to achievement of those objectives.

 The classification of employers who are covered by the Strikebreaker's Act is not concerned with fundamental rights or with a suspect class. *See San Antonio v. Rodriguez,* 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.*2d 16 (1973). Nor does it fall within the intermediate category. The classification is not akin to a suspect group, nor is the indirect impact so substantial on any fundamental right as to warrant the intermediate test. Rather, the act involved here is "economic" legislation, a type usually tested by rational relationship criteria. *City of New Orleans v.*

*Dukes,* 472 *U.S.* 297, 303, 96 *S.Ct.* 2513, 2516, 49 *L.Ed.*2d 511, 517 (1976). Accordingly, there is a strong presumption of constitutionality. The plaintiff has the burden of demonstrating that the classification is palpably arbitrary or capricious, there being no possible rational basis for the distinction. *See generally Vornado, Inc. v. Hyland,* 77 *N.J.* 347, 353–56 (1978). As discussed previously, the legislative purposes are legitimate and the State's classification of coverage for those not falling within the penumbra of the federal act is a reasonable one, there being the practical problem that part of the subject matter has been preempted by Congress. We conclude that there has been no violation of the Equal Protection Clause in the Federal Constitution.

▮ The state standard for equal protection "parallels that under the federal Constitution," *Levine v. Institutions and Agencies Dep't of N. J.,* 84 *N.J.* 234, 257 (1980). We discern no reason to analyze this case differently in that respect and therefore conclude that the Act is not violative of equal protection concepts embodied in the State Constitution. *See Washington National Ins. Co. v. Board of Review,* 1 *N.J.* 545, 553 (1949).

## IV

## COMMERCE CLAUSE

Plaintiff argues next that section 13C–1(c) violates the Commerce Clause, *U.S.Const.,* Art. 1, § 8, cl. 3, in that the section prohibits the importation or supplying from without the state of any person for the purpose of replacing employees on strike or locked out. The pertinent language reads as follows:

It shall be unlawful for any person ... to import from outside the boundaries of the State of New Jersey, or to transport within the State of New Jersey, or to supply *from without the State* any person ...." (emphasis supplied)

The Act as originally drafted has this same language except the phrase "from without the State." Assembly No. 548, March 21, 1960. The bill was amended in the Senate by the insertion of

that phrase after the word "supply." See Senate Committee Amendment to Assembly No. 548, November 28, 1960. The Assembly accepted this amendment. This legislative history strongly suggests that the Legislature intended an out-of-state prohibition broader than the intrastate restriction against transportation. Thus the statute prohibits the importing and supplying of personnel from without the State as distinguished from the intrastate restriction against transportation.

The Commerce Clause gives Congress the power to regulate "commerce" among the states. Initially, we are satisfied that the movement of people constitutes "commerce." In *Edwards v. California*, 314 *U.S.* 160, 62 *S.Ct.* 164, 86 *L.Ed.* 119 (1941), a California statute that forbade the transportation of indigent persons into the state was held to violate the Commerce Clause. The Supreme Court observed that "it is settled beyond question that the transportation of persons is 'commerce' within the meaning of [the Commerce Clause]." 314 *U.S.* at 172, 62 *S.Ct.* at 166, 86 *L.Ed.* at 124.

When, as here, Congress has not preempted the field, states may enact legislation that touches upon interstate commerce. *See generally K. S. B. Technical Sales Corp. v. North Jersey District Water Supply Comm'n*, 75 *N.J.* 272, 294–300 (1977). When a state acts to prohibit out-of-state competition, a virtually *per se* rule of invalidity has been applied. *Philadelphia v. New Jersey*, 437 *U.S.* 617, 624, 98 *S.Ct.* 2531, 2535, 57 *L.Ed.2d* 475, 481 (1978). *See also Baldwin v. G.A.F. Seelig, Inc.*, 294 *U.S.* 511, 527, 55 *S.Ct.* 497, 502, 79 *L.Ed.* 1032, 1040–41 (1935). But when the legislation promotes the health, welfare and safety of its inhabitants, the analysis then requires that a determination be made as to whether the effect of the statute on interstate commerce is only incidental. If the burden is clearly excessive in relation to the local interest, the statute will be declared invalid. The extent to which a burden on interstate commerce will be tolerated depends on the nature of the local interest and on whether that local interest could be promoted in an alterna-

tive fashion without such a burden. *Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970). Justice Brennan in *Hughes v. Oklahoma,* 441 *U.S.* 322, 99 *S.Ct.* 1727, 60 *L.Ed.*2d 250 (1979), summarized the approach as follows:

> Under the general rule [of determining whether the burden imposed on interstate commerce is permissible] we must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce. The burden to show discrimination rests on the party challenging the validity of the statute, but "[w]hen discrimination against commerce ... is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advertising Comm'n,* 432 *U.S.* 333, 353, 97 *S.Ct.* 2434, 2446, 53 *L.Ed.*2d 383 (1977). [*Id.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.*2d at 262]

The statute on its face discriminates against interstate commerce. It prohibits anyone from supplying any person from without the state to a prospective employer within the state. This ban does not apply to those within the state, the limitation in that respect being restricted to a prohibition of *transportation* within the state. No reason has been advanced to treat out-of-state individuals differently from those within the state. Neither the concept of preventing violence during strikes nor the intent to modify the bargaining power relationship between management and labor justify this difference. The statute creates artificial barriers cutting across a national labor market in a fashion inconsistent with the existence of a national free trade zone. *Cf. Toomer v. Witsell,* 334 *U.S.* 385, 68 *S.Ct.* 1156, 92 *L.Ed.* 1460 (1948) (holding South Carolina statute imposing significantly greater tax on nonresident-owned shrimp boats than on resident-owned ones violative of the Federal Constitution); *Edwards v. California, supra* (holding California statute forcing out indigent immigrants invalid); *Foster-Fountain Packing Co. v. Haydel,* 278 *U.S.* 1, 49 *S.Ct.* 1, 73 *L.Ed.* 147 (1928) (enjoining Louisiana statute permitting the shipment of shrimp to other states only if the heads and hulls had previously been removed).

Such facial discrimination "at a minimum" invokes "the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma, supra,* 441 *U.S.* at 337, 99 *S.Ct.* at 1736, 60 *L.Ed.2d* at 262. The State has failed to meet its burden of justifying the impact on interstate commerce in relation to the local benefits flowing from the statute. Lastly, it has not demonstrated the unavailability of nondiscriminatory alternatives. *See Service Mach. & Shipbuilding Corp. v. Edwards,* 617 *F.2d* 70, 76 (5th Cir.), aff'd mem., 449 *U.S.* 913, 101 *S.Ct.* 310, 66 *L.Ed.2d* 142 (1980).

The next question is whether the phrase "or to supply from without the State" may be severed from the statute. This accords with the principle in *N.J.S.A.* 1:1–10 that if any part of a statute is unconstitutional, the statute to the extent that it is constitutional shall be effectuated. The provision at issue here may be excised without substantial impairment of the principal object of the section. *Inganamort v. Borough of Fort Lee,* 72 *N.J.* 412 (1977). The remainder of the section would prohibit the transportation within the State and importation from without the State of replacement employees. We believe in this respect the Legislature intended to equate the activity, whether within or without the State. The thrust of the provision as modified would be to shift the economic balance between employer and employee to the extent that the employer could not transport proposed replacement employees either within or without the State. Reference previously has been made to the strong legislative desire to effectuate this type of modification. See *ante* at 154. Accordingly, we find that as interpreted section 13C–1(c) does not violate the Commerce Clause.

With the removal of the phrase "or to supply from without the State" and interpretation of the balance of the statute so that all, whether resident or nonresident, are treated the same, the challenge to the provision under the Privileges and Immunities Clause of the Federal Constitution must fail. We find the

claims of special legislation under the State Constitution, Art. IV, § 7, ¶ 8, and vagueness under the Due Process Clause (this argument related to the phrase "lawfully on strike" in section 13C–1(c)) to be without merit.

## V

We conclude that the Strikebreakers Act is preempted by federal labor law as to employers and employees falling within the NLRA. As to noncovered NLRA situations, we conclude that sections 13C–2 and 13C–3 are valid and that section 13C–1(c) with the excision of the objectionable phrase "or to supply from without the State" is likewise valid. The judgment of the trial court is affirmed in part and modified as herein provided as to sections 13C–1(c), 13C–2 and 13C–3.

*For affirmance in part and modification in part*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.