290 MADISON CORPORATION and
James Delaney and Helen
Delaney, Plaintiffs,

v.

Carmine E. CAPONE et al., Defendants.

Civ. A. No. 76–1600.

United States District Court,
D. New Jersey.

March 12, 1980.

Anthony M. Mahoney, Bernstein & Mahoney, Cranford, N. J., for plaintiffs.

Francis J. Dooley, Orange, N. J., for defendants Capone et al.

Alfonso C. Viscione, Orange, N. J., for defendant Members of Rent Leveling Bd. of the City of Orange.

## OPINION

WHIPPLE, Senior Judge.

This is an action brought under the Civil Rights Act, 42 U.S.C. § 1983, to redress alleged violations of plaintiffs' constitutional rights by defendant officials of the City of Orange, New Jersey. Plaintiffs are landlords in the City of Orange. Their complaint alleges that defendants, members of the city's Rent Leveling Board, members of the City Council and the Mayor, acting either conspiratorily or separately, violated their constitutionally-protected property rights by arbitrarily, capriciously and unlawfully regulating the rents plaintiffs were permitted to charge tenants in one of their apartment buildings. Plaintiffs alleged that defendants' actions caused economic losses to plaintiffs, eventually resulting in the loss of their apartment building through mortgage foreclosure. Plaintiffs seek compensatory and punitive damages, attorneys' fees and costs.

The case was tried to the Court, sitting without a jury, in September 1979. The parties submitted trial briefs, post-trial memoranda and proposed findings of fact and conclusions of law. After careful review of all testimony, exhibits, memoranda and oral argument the Court hereby adopts the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

Plaintiffs James and Helen Delaney are engaged in the business of purchasing apartment · buildings and renting out the individual units. In connection with their business the Delaneys have created corporations to hold title to their properties. One such corporation, wholly owned by the Delaneys, is plaintiff 290 Madison Corporation (hereinafter referred to as "the corporation").

In 1968 the corporation purchased an apartment building located at 466 Highland Avenue in Orange, New Jersey. The purchase price was $385,000. The Delaneys "loaned" to the corporation approximately $75,000 for the purchase. The corporation assumed the seller's first mortgage in the amount of $255,000 and the seller's second mortgage in the amount of $55,000.

In 1972 the property was re-mortgaged to the Independence Savings Bank of Brooklyn, New York for $350,000. The corporation paid off the original first and second mortgages in full with the proceeds of the new mortgage. The balance, approximately $62,000, was remitted to the corporation. This sum was then withdrawn from the corporation by Helen Delaney, purportedly as partial repayment of the $75,000 which she and James Delaney had loaned to the corporation in 1968 for the purchase of the property. Thus the corporation was left with virtually no cash and an apartment building with a mortgage indebtedness in the amount of $350,000. The corporation may fairly be described as an owner with extremely "thin" equity in the apartment building.

On November 1, 1972 the corporation conveyed the 466 Highland Avenue property to the Delaneys without consideration. The mortgagee was apparently not advised of this transfer. The corporation remained liable on the mortgage note.

On November 10, 1972 the City Council of the City of Orange passed an ordinance (hereinafter referred to as the "Rent Leveling Ordinance") which created the Orange Rent Leveling Board (hereinafter "RLB") and established procedures regulating rents

on certain properties. The ordinance was amended eleven times thereafter. As applied to multiple unit dwellings like 466 Highland Avenue, the ordinance provided that landlords could apply to the RLB for 4% rent increases which the RLB would grant unless the landlord in question were found not to be in substantial compliance with state and local housing codes.[1] It is the defendants' application of the ordinance to plaintiffs' property which is the predicate for the instant complaint.

Beginning in 1973 tenants of the Highland Avenue building began to complain about the condition of the premises and the services (or lack thereof) provided by plaintiffs. The complaints culminated in a rent strike.

In April 1974 the corporation notified the tenants that it was seeking a 4% rent increase as allowed by the Rent Leveling Ordinance. The tenants appealed to the RLB, seeking that it deny the increase and instead roll back the rents due to an alleged decrease in services and maintenance in the building. The allegations pertaining to the property were substantiated by a report of city housing inspectors enforcing the state and local housing codes. The report was released on June 3, 1974 and contained a list of 124 code violations.

The RLB heard the tenants' appeal for the first time on July 9, 1974, and this hearing was continued on August 13, 1974. Plaintiffs, the Delaneys, presented their views at both meetings, although the presence of angry tenants rendered the sessions somewhat stormy. On August 14, 1974, the RLB by resolution denied the 4% increase and rolled back the rents $20.00 per apartment per month. The resolution, although passed with only a single member voting, was made in accordance with the RLB's own parliamentary rules of procedure.

The plaintiffs appealed the RLB's decision to the Commissioners of the City of Orange. The Commission functioned as an appellate tribunal from decisions of the RLB. The Commission refused to hear the case. Plaintiffs Delaneys sued in state court to compel the Commission to act. The state court remanded the matter to the Commission, which in turn remanded it to the RLB for a further hearing. This hearing was held in November 1974. Both the tenants and plaintiffs Delaneys testified. The RLB thereafter reaffirmed its earlier decision denying the 4% increase and rolling back the rents on all apartments.

In March 1975 the Delaneys filed a second suit in state court. They sought to have the actions of the RLB and of the Commission declared an inverse condemnation constituting an unconstitutional taking of property. This second state court action named as defendants the RLB and the Commission but not the individual members of those bodies. The state trial court found against the Delaneys on the constitutional issue, even though a judgment of foreclosure had been entered against the property (April 1977) some six months prior to entry of the state court judgment (September 1977). The state appellate court affirmed the lower court ruling in April 1979.

Plaintiffs' disputes with the city officials and the tenants' disputes with plaintiffs continued throughout 1975. In July 1975 the RLB found that the housing code violations upon which the rent rollbacks were based had been abated, and the RLB restored the "rolled-back" rents and granted the 4% rent increase which plaintiffs had requested more than a year before.

The tenants immediately objected. Additional hearings were held throughout the summer of 1975. At the hearings plaintiffs asserted and tenants disputed that the rollbacks and the denial of the 4% increase were causing plaintiffs severe financial hardship.

---

1. The provision of the Orange Rent Leveling Ordinance which conditioned 4% rent increases on a finding that the landlord was in substantial compliance with state and local housing codes was in 1977 declared by a New Jersey state court to be an invalid exercise of municipal power, under the authority of *Modular Concepts, Inc. v. South Brunswick Township*, 146 N.J.Super. 138, 369 A.2d 32 (App.Div. 1977). However, that declaration of invalidity does not affect this Court's analysis or conclusions. *See* text at p. 1353 *infra*.

In the spring of 1975 plaintiffs stopped making mortgage payments on the property. In September 1975 the mortgagee instituted a foreclosure action in a New Jersey state court. A judgment of foreclosure was entered on April 18, 1977, and the property was sold shortly thereafter.

Plaintiffs filed the instant complaint on August 13, 1976. The named plaintiffs were the Delaneys, trading as the 290 Madison Corporation. At an early stage of the litigation, when the case was before another judge in this district,[2] plaintiffs' counsel represented to that judge that the property was owned by the corporation and not by the Delaneys. Consequently, the complaint was amended to delete the Delaneys and add the corporation as the sole plaintiff. But, on the eve of the conclusion of trial (in September 1979), it emerged that the Delaneys, and not the corporation, held title to the property since 1972. Plaintiff corporation moved at that time to amend the complaint to add the Delaneys as plaintiffs. The Court granted the motion to amend under Fed.R.Civ.P. 15(a) & (c).

In addition to all of the foregoing facts, the evidence adduced at trial established that plaintiffs depreciated the 466 Highland Avenue property (as well as most if not all of their other apartment buildings) using an accelerated method of depreciation. The use of accelerated depreciation methods, though perfectly lawful under the Internal Revenue Code, see I.R.C. § 167(b), has the effect of artificially inflating expenses and thereby creating, "on paper", a smaller net profit (or larger net loss) than an individual actually[3] incurs. See generally T. Fiflis & H. Kripke, Accounting for Business Lawyers, 211–14 (1971); Note, Accelerated Depreciation and State Ratemaking Policy: The Case of California, 31 Stan.L.Rev. 265, 267–70 (1979). On account of the use of an accelerated method of depreciation, plain-

tiffs' Highland Avenue property showed depreciation of approximately $209,000 for the period 1972–1977.

The evidence also established that plaintiff 290 Madison Corporation was nothing more than the *alter ego* of plaintiffs Delaneys, a true "shell" corporation. The Delaneys used the building's substantial depreciation as an expense for purposes of their personal income tax returns[4] and withdrew funds from its capital account just as if that account were their personal property.[5] In short, there was never a clear demarcation between the financial accounts and affairs of the individuals and those of their corporate creation, such that the creation never had an existence independent of and separate from its creators.

## CONCLUSIONS OF LAW

### A. Res Judicata

The law is well-established that the doctrine of res judicata applies as between state and federal court actions. In the leading case in this area the Supreme Court held:

> [I]f a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then . . . he has elected to forgo his right to return to the District Court.

*England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 419, 84 S.Ct. 461, 467, 11 L.Ed.2d 440 (1964). *Accord, New Jersey Education Association v. Burke*, 579 F.2d 764, 774–76 (3d Cir. 1978). The doctrine is fully applicable to § 1983 actions. *Preiser v. Rodriguez*, 411 U.S. 475, 497, 93 S.Ct. 1827, 1840, 36 L.Ed.2d 439 (1973); *Bennun v. Board of Governors of Rutgers*, 413 F.Supp. 1274, 1278 (D.N.J.1976). In addition, res judicata will bar federal relief

---

2. The Honorable H. Curtis Meanor.

3. In terms of decreased revenues or increased out of pocket expenses.

4. The corporation never filed an income tax return.

5. The most stunning example of this is the Delaneys' withdrawal of approximately $62,000 from the corporation when it received that sum as surplus proceeds from the mortgage recasting. The withdrawal left the corporation severely under-capitalized vis-a-vis the maintenance and repair of and mortgage payments on the building.

on a claim previously litigated in the state courts even though the federal court defendants are different from the state court defendants. *Rosenberg v. Martin*, 478 F.2d 520, 525 (2d Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *Clem v. Cooper Communities, Inc.*, 344 F.Supp. 579, 586 (E.D.Ark.1972); *Schmitt v. Jacobson*, 272 F.Supp. 301, 304 (D.Mass.1967).

■ In the instant case the evidence established that plaintiffs' federal constitutional claim is practically indistinguishable from their state claim. To wit, in both fora plaintiffs have alleged that the actions of the RLB and the Commission in regulating the rents on their apartment building, allegedly causing the loss of the building through mortgage foreclosure, constitute an unconstitutional taking of property without due process of law. This claim was expressly considered and rejected by the New Jersey state courts. Accordingly, the Court concludes that the principle of res judicata bars any federal relief. That plaintiffs here sued the individual RLB and Commission members, whereas in the state courts they sued the RLB and Commission as wholes, does not affect this conclusion. *See Clem, supra,* 344 F.Supp. at 586.

My conclusion on the issue of res judicata is dispositive of this case. However, because plaintiffs were afforded (improvidently, it now appears in retrospect) a full trial on their claims, I deem it in the interests of judicial economy to address the merits of the case. *See generally id.*

B. *Causation*

■ It is established beyond the necessity for citation that a plaintiff has not proved that he has a cause of action unless he has proved that there was a concurrence of damage and wrong. The maxim is that damage without wrong, or "damnum absque injuria", does not constitute a cause of action. *Alabama Power Co. v. Ickes*, 302 U.S. 464, 479, 58 S.Ct. 300, 303, 82 L.Ed. 374 (1938); 1 Am.Jur.2d *Actions* § 70 (1962). One logical inference from this maxim is that a plaintiff has the burden of proving that his injury was proximately caused by an act of the defendant. Another is that plaintiff must prove that defendant's ac-

tions constitute a legal wrong. For the reasons which follow the Court concludes that plaintiffs have failed to carry their burden.

Stripped to its essence, plaintiffs' complaint is that defendant officials' refusal to allow a 4% rent increase and to restore the $20 per month per apartment rollback directly caused plaintiffs economic losses resulting in mortgage foreclosure on the building.

While there can be little doubt that defendants' rent-regulating actions decreased the rate of return on plaintiffs' investment, this does not per se constitute an unconstitutional taking of property. Regulatory bodies enjoy wide discretion in limiting the rate of return on investments in areas which, like multiple dwelling housing, have long been regarded as in need of oversight and control. *See generally D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission*, 151 U.S.App.D.C. 223, 247–252, 466 F.2d 394, 418–23 (D.C. Cir.), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972). Only when a return from operations is confined to an amount below the point of confiscation does the specter of a constitutional violation appear. *See, e. g., Denver Stock Yard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469 (1938). For purposes of analysis in the instant case the point of confiscation may be regarded as the loss of the building through mortgage foreclosure. Thus, only if plaintiffs had proved that defendants' regulatory actions proximately caused the foreclosure would plaintiffs have proved confiscation.

It is far from clear whether plaintiffs' loss of the building is fairly attributable to anything but their choosing to maintain thin equity in the property. As noted earlier, after the mortgage was recast, but while the property was still owned by the corporation, the Delaneys withdrew some $62,000 in surplus mortgage proceeds from the corporation. There is no evidence that this money was set aside in a capital account which could be tapped to make repairs or to meet mortgage payments in the event of

decreased rental income and/or increased operating expenses. In addition, the Delaneys' failure assiduously to separate their personal income, expenditures and financial accounts from those of the building, and their use of the building's substantial depreciation deductions for their personal income tax benefit, compels the conclusion that, for purposes of determining whether the mortgage foreclosure was causally related to defendants' actions, the corporate and individual plaintiffs must be treated as a single business entity. This confluence of corporation and individuals is absolutely fatal to proof that defendants proximately caused the mortgage foreclosure, for the evidence established that the Delaneys had income from their other investments easily sufficient to meet the mortgage payments and thereby avoid foreclosure.[6]

Even assuming proof that defendants' actions caused the loss of plaintiffs' building, recovery would not necessarily follow, for the second requirement of the doctrine of "damnum obsque injuria" is proof that the complained of acts constitute a legal wrong. *Alabama Power, supra* 302 U.S. at 479, 58 S.Ct. at 303. This second requirement has also not been met.

Plaintiffs might have established legal wrong under the circumstances of this case by showing that defendants applied the economic sanctions of the Rent Leveling Ordinance without cause and/or without affording plaintiffs a fair hearing. *See, e. g., Reilly v. Doyle*, 483 F.2d 123, 128 (2d Cir. 1973). Legal wrong cognizable under § 1983 is clearly not established by plaintiffs' showing that a portion of the ordinance was declared invalid under state law, absent proof that the ordinance was applied in a purposefully discriminatory manner. *See generally Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Ortega Cabrera v. Municipality of Bayamon*, 562 F.2d 91, 102 (1st Cir. 1977).

Plaintiffs have not established that the sanctions of the Rent Leveling Ordinance were applied to them without cause. The evidence established that plaintiffs' apartment building was cited for 124 housing code violations in 1974 and that the tenants were constantly complaining to city officials concerning the lack of services and state of disrepair throughout the premises. The defendant officials responded to these complaints and to the housing code violations report by holding numerous hearings which, though at times tumultuous, met the minimum constitutional requirements of due process. *See, e. g., Wilson v. Lincoln Redevelopment Corp.*, 488 F.2d 339, 342 & n.7 (8th Cir. 1973). The economic sanctions were imposed after the hearings.

To summarize, the Court's conclusion is that even assuming *arguendo* that plaintiffs have proved proximate causation (a proposition earlier rejected), they have failed to prove that defendants' actions were taken for reasons other than to further the public interest. Plaintiffs have no ground to complain of a legal wrong or confiscation when government officials act to limit revenues in response to bona fide complaints of poor service. A similar complaint was considered and rejected in *D.C. Transit, supra*, where the owner of a bus system challenged the Transit Commission's ratemaking as unconstitutional. The Court of Appeals said:

> Transit's argument has one central theme: its revenues cannot be permitted to fall below the level of fair return, and surely not below the breakeven point, no matter what the circumstances, and even if its management is uneconomical and inefficient and its service inadequate. If Transit is correct, the Commission is powerless to sanction corrective measures . . . .. If Transit is correct, it may disregard its public responsibilities at will—as the Commission found that it has frequently done—and yet insist that the public respond to its demands for higher

6. The fact that plaintiffs used accelerated depreciation, which has distorting effects on financial statements, *see* text at p. 1351, *supra*, is

another factor tending to belie plaintiffs' allegations of financial debilitation at defendants' hands.

**1354**

fares. We cannot accept that position.

. . .

The Due Process Clause strikes a balance between competing governmental and private interests at the point of reasonableness. Action rationally subserving a substantial governmental concern draws condemnation on due process grounds only if it is arbitrary or unreasonable.

466 F.2d at 422 (footnotes and citations omitted).

C. *Qualified Immunity*

■ Nonjudicial government officials who perform functions of an adjudicatory nature enjoy qualified immunity to § 1983 suits for damages. *See Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 246–47, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974). The Court concludes that the instant defendants are nonjudicial government officials who perform adjudicatory functions and who therefore are eligible to avail themselves of the protective umbrella of qualified immunity. *See Thompson v. Burke,* 556 F.2d 231, 236 (3d Cir. 1977); *Chase v. McMasters,* 573 F.2d 1011, 1019 (8th Cir. 1978); *Cameron v. Montgomery County Child Welfare Service,* 471 F.Supp. 761, 766 (E.D.Pa.1979).

■ The aforementioned immunity is "qualified" in the sense that two conditions must obtain in order for it to protect a particular defendant. First, the official must act without malice. Second, the official must not have known or reasonably cannot be expected to have known that his actions would violate plaintiffs' constitutional rights. *Wood, supra,* 420 U.S. at 322, 95 S.Ct. at 1001; *Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53, 61 (3d Cir. 1976); *Cameron, supra* at 766. Qualified immunity is not a presumption which plaintiffs must rebut but rather is an affirmative defense which must be pleaded and as to the elements of which, *see Skehan, supra* at 61, defendants have the burden of proof. *See id.; Cameron, supra* at 766. *See also O'Connor v. Donaldson,* 422 U.S. 563, 576–77, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975).

■ In the instant case defendants never formally pleaded qualified immunity. Nevertheless, the Court holds that the defense is properly considered because it was expressly raised by defendants' counsel in argument and evidence introduced in its support without objection by plaintiffs' counsel. This indicates that there was implied consent to trial of the issue. *See* Fed.R.Civ.P. 15(b); *Dell v. Heard,* 532 F.2d 1330, 1332 (10th Cir. 1976); 3 Moore's Federal Practice ¶ 15.13[2], at 165 (2d ed. 1979).

The Court concludes that defendants have established by a preponderance of the evidence that they pass the two-pronged test necessary to afford them immunity. First, there is no substantial evidence that any defendant acted with malice, i. e., with the subjective intent to harm plaintiffs. *See Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978); *Wood, supra,* 420 U.S. at 322, 95 S.Ct. at 1001. Second, the Court holds that because there is here lacking compelling evidence that defendants' actions are causally related to plaintiffs' injury, *see* conclusions in part B, *supra,* defendants cannot logically be regarded as having had actual or constructive knowledge that the actions which they took within their spheres of official responsibility would violate plaintiffs' constitutional rights. *See id.* Accordingly, defendants are immune to plaintiffs' action for damages.

For all of the foregoing reasons plaintiffs are not entitled to recover damages from defendants. Each side to bear its own costs.

Counsel for the defendants shall submit an appropriate order within seven (7) days of the filing date of the within opinion.