191 N.J. Super. 166 (1983)
465 A.2d 934
DR. PHILIP B. EATOUGH, JR., ET AL., APPELLANTS,
v.
BOARD OF MEDICAL EXAMINERS, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 1983.
Decided August 1, 1983.
*169 Before Judges MATTHEWS, ANTELL and FRANCIS.
Ronald L. Davison argued the cause for appellants (Gern, Stieber, Dunetz, Davison & Weinstein, attorneys; Ronald L. Davison and Marc C. Gettis, on the brief).
Joan D. Gelber, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
This is an appeal from the Board of Medical Examiners.
*170 There are two types of medical schools in the United States, allopathic and osteopathic. Graduates of American allopathic medical schools are awarded an M.D. degree. Graduates of American osteopathic medical schools are awarded a D.O. (Doctor of Osteopathy) degree.
These two types of schools may be distinguished by their approach to healing. The osteopathic approach to treatment arose in the United States in the late 19th Century. That approach centered on the belief that the proper functioning of the various parts of the musculoskeletal system is crucial to maintaining health and preventing or curing disease. Historical osteopathic practice used only techniques of bio-mechanics to manipulate the neuromusculoskeletal system in order to return the various bodily systems to their naturally harmonious state. Prescription drugs and surgery were not accepted treatment modalities.
Osteopathy no longer defers the use of drugs and other medications and measures in the treatment of disease, but osteopathic medical schools require their students to take courses in osteopathic theory and manipulation. There are presently 14 osteopathic medical schools in the United States, and each such school provides medical education which is at least minimally equivalent in both substance and quality to that which is provided in the American nonosteopathic medical schools. In New Jersey, osteopathic medical schools are required by the Board to provide the same minimum curriculum as is required of all other approved medical schools.
It is the expressed legislative policy of the State as well as the policy of the Board to recognize graduates of osteopathic medical schools as fully competent in every respect to practice medicine and surgery. There are over 21,000 licensed M.D.'s in New Jersey (including graduates of foreign medical schools) and there are approximately 1,600 licensed D.O.'s. Each of the four plaintiffs in this action is a graduate of an American osteopathic medical school and each has received a D.O. degree. Each is *171 licensed to practice medicine and surgery in New Jersey and all have the designation D.O. inscribed on their licenses (i.e., "Philip B. Eatough, D.O."). None of the plaintiffs use osteopathic manipulative techniques nor do they follow osteopathic principles in their practice.
The four plaintiffs have instituted this action against the Board to challenge the validity of N.J.S.A. 45:9-16 and N.J.A.C. 13:35-4.1 and 13:35-6.13. The challenged provisions contain affirmative requirements on the minimum content of professional commercial advertisements and also prohibit advertising which is false and deceptive in content or which presents serious potential for abuse (advertisement in the electronic media is prohibited, N.J.A.C. 13:35-6.13(d)).
The New Jersey Medical Practices Act, N.J.S.A. 45:9-1 et seq., contemplates that the Board issue a license to practice medicine and surgery for all physicians who have met specified requirements. Under the Board's licensing scheme, however, all licensed physicians and surgeons who have graduated from American allopathic medical schools with an M.D. degree, and all foreign medical school graduates (FMGs) regardless of the degree awarded to them, are issued licenses inscribed with the M.D. designation. Those physicians are required to hold themselves out to the public as M.D.'s. All physicians and surgeons who are graduates of American osteopathic medical schools and who have received D.O. degrees, whether or not they choose personally to employ osteopathic treatment techniques, are issued licenses with the inscription D.O. and are required to hold themselves out to the public as D.O.'s.
Some physicians have been issued licenses which are inscribed D.O., M.D. (i.e., John Smith D.O., M.D.). The physicians holding those licenses obtained them as a result of action taken by the California legislature in 1962. Legislation was passed there which authorized California's osteopathic medical school to confer the M.D. degree. In that year a number of persons with the D.O. degree exchanged their diplomas for M.D. degrees with *172 California's permission. Subsequently some of those physicians requested New Jersey to recognize the new degrees. The State issued licenses to those physicians who carry both designations. Those physicians must continue to carry the D.O. designation (with the M.D. designation) in any holding out to the public. In 1963, California discontinued that practice. Thus, the class of physicians whose licenses carry both the D.O. and M.D. designation is quite limited.
N.J.A.C. 13:35-4.1 (Degree Designation Rule) provides:
A physician licensed to practice medicine and surgery in the State of New Jersey shall identify himself only by that degree designation (M.D. or D.O.) which imprinted [sic] on the license issued to said person by the board; for example, John Doe, M.D., Joe Doe, O.D., Dr. John Doe, M.D. or Dr. John Doe, D.O.
N.J.A.C. 13:35-6.13(b) (Provision of information to the public) provides:
(b) A licensee in the State of New Jersey may provide information to the public, by publication in a dignified manner in newspapers or comparable written publications concerning: education, certification or appointment, location and availability of services, fees for routine professional services and other pertinent information about the licensee's practice. On any such publication, license degree must be designated. To the extent that information provided to the public by the licensee may be misleading, the licensee shall provide clarification, such as, but not limited to, whether additional charges may be incurred for related services when fees are stated.
Plaintiffs in this case are of the opinion that a substantial segment of the population does not understand the meaning of D.O., and that along with those persons who do understand the designation, believes that D.O.'s are either not qualified to practice medicine and surgery as is a physician who is required to use the M.D. designation, or are less competent than the latter. Plaintiffs, therefore, all use the suffix M.D. and not D.O. in their dealings with the public (i.e., in the telephone directory; on signs). Plaintiff Eatough made a written request to the Board that a new medical license be issued to him with the suffix M.D., but the Board refused. All four plaintiffs have been threatened with disciplinary action by the Board unless they cease using the M.D. suffix in their professional activities *173 and advertising. (The Board has agreed not to take any disciplinary action while this appeal is pending). The Board has the power to suspend or revoke a physician's license upon proof of improper advertising. N.J.S.A. 45:9-16.
Plaintiffs are demanding, among other things, that this court issue an order directing the Board to issue each of the plaintiffs a new plenary license to practice medicine and surgery in the State of New Jersey with the designation M.D. following his name. Plaintiffs also demand that they be permitted to advertise using the M.D. designation free from interference by the Board.
In May 1979, one of the plaintiffs, Eatough, filed an action against the Board in the United States District Court for the District of New Jersey, challenging the same statutory and administrative provisions challenged in the present action. In an unreported opinion dated March 25, 1981 the District Court rejected Dr. Eatough's claims. The doctor appealed and the Third Circuit Court of Appeals affirmed the judgment of the District Court with one judge dissenting. Eatough v. Albano, 673 F.2d 671 (3 Cir.1982), cert. den. 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982). A central issue in the present case is whether principles of res judicata and collateral estoppel bar this action entirely.

I
Plaintiffs Griggs, Van Dyken and Haberman were not parties to the federal court action and no final judgment has been entered in any court with respect to the issues raised here which would be binding on those plaintiffs.
New Jersey requires for the application of res judicata identity of causes, of parties or their privies, and of issues. New Jersey  Philadelphia etc. v. N.J. State Bd., 654 F.2d 868, 876 (3 Cir.1981). In the last cited case, Judge Gibbons refused to apply the doctrine of res judicata to bar the claims of a group of plaintiffs only one of whom had been a party to prior state court *174 litigation. In the federal litigation it was asserted by the opposing party that the same issues were being raised that had been litigated in the state court action. Id. at 876. There was no showing in federal court that the plaintiff in the prior state court litigation was acting as a privy in that state litigation for the new plaintiffs in the federal litigation. Id. Moreover, as concerns the prior plaintiff, new issues were presented in the federal litigation which had not been litigated in the state proceedings. Id. Judge Gibbons stated that barring the claims of the federal plaintiffs who had not been involved in the state litigation by applying the doctrine of res judicata would be a violation of the due process clause of the Fourteenth Amendment. Id.
In this case, the Board has made no showing that Eatough was a privy for Griggs, Van Dyken and Haberman in the federal court litigation. Griggs, Van Dyken and Haberman are entitled to be heard. We will not apply the doctrine of res judicata to bar the claims of Griggs, Van Dyken and Haberman.
We note that the Board cites 290 Madison Corp. v. Capone, 485 F. Supp. 1348 (D.N.J. 1980), as holding that res judicata will bar federal relief on a claim previously litigated in state courts even though the federal court plaintiffs are different from the state court plaintiffs. That is not the holding of that case, and the case does not otherwise assist the disposition of the issues here. In Madison, the same plaintiffs who had sued in state court and lost were barred by res judicata from bringing their claim in federal court. Id. at 1352. The Madison court found that although the defendants were different, res judicata still applied. Defendants in the state court action were the Orange New Jersey Rent Leveling Board (as a body) and the Commissioners of the City of Orange (as a body). In the federal action, those bodies were not sued; rather plaintiffs sued the members of both bodies individually. Id. at 1352.
The State also asserts that the doctrine of collateral estoppel should apply to bar the claims of plaintiffs Griggs, Van *175 Dyken and Haberman. In New Jersey, that doctrine precludes relitigation only of questions "`distinctly put in issue'" and "`directly determined'" adversely to the party against which the estoppel is asserted. New Jersey-Philadelphia, etc., 654 F.2d at 876, citing City of Plainfield v. Public Service Electric and Gas, 82 N.J. 245, 257-258 (1980); N.J. Manufacturers Insurance Co. v. Brower, 161 N.J. Super. 293, 297 (App.Div. 1978). The Board asserts that all of the issues in the present case were raised by Dr. Eatough in the federal court and were decided against him. Assuming that is true, the Board asserts that the claims of the other plaintiffs are barred because they are the same claims and because Dr. Eatough's interests are so closely aligned with the interests of the other plaintiffs that he was virtually their representative in the federal action.
It is true in this State that in order for the doctrine of collateral estoppel to apply and to conclude an issue against a party in a particular action, the parties to that action need not be identical to the parties who litigated the issue in a prior proceeding. Brower, 161 N.J. Super. at 298. But it seems that, at least, the party precluded from relitigating the issue must have had (or his privy must have had) a full and fair opportunity to litigate the issue in the first action. Brower, 161 N.J. Super. at 298-299. Griggs, Van Dyken and Haberman are not in privity with Eatough. Their rights do not derive from his in any way. While there may be an identity of interests between the four plaintiffs here, the record does not permit the conclusion that Dr. Eatough was the representative of the other plaintiffs in the federal litigation. Thus, we conclude that plaintiffs Griggs, Van Dyken and Haberman, are not collaterally estopped from asserting any of their claims against the Board. This conclusion is further supported by the fact that the New Jersey courts have yet to pass on the issues presented here and this court may decide differently than the federal courts decided some of the issues presented here. See Eatough v. Albano, 673 F.2d at 680 (Weis, J., dissenting).
*176 With respect to the claims of plaintiff Eatough, our analysis of the pleadings and the opinions in the federal courts satisfies us that most of the allegations set forth in this action have been adjudicated in those courts. Accordingly, we find that plaintiffs Griggs, Van Dyken and Haberman are entitled to prosecute all of their claims in this case, and that plaintiff Eatough is barred from litigating those claims actually determined by the federal courts.

II
Plaintiffs assert that N.J.S.A. 45:9-18 permits a physician with a D.O. degree to hold himself out as a medical practitioner without having to designate himself by any particular title. Therefore, they claim, N.J.A.C. 13:35-4.1, 13:35-6.13 contravene the Medical Practices Act. We find the reasoning of the Third Circuit Court of Appeals persuasive and hold as they did, that the rules do not conflict with that section. Eatough v. Albano, 673 F.2d at 675. Plaintiffs here also assert, however, that the Board has acted in excess of its powers and contrary to the Medical Practices Act by its practice of inscribing D.O. on the licenses of physicians who have been awarded D.O. degrees and M.D. on the licenses of all other physicians (both those who have been awarded an M.D. degree and foreign medical school graduates) and by promulgating N.J.A.C. 13:35-4.1 and 13:35-6.13.
Plaintiffs argue that the Board's authority is restricted to the issuance of a "license ... to practice medicine and surgery," N.J.S.A. 45:9-16, and to the adoption of interpretative rules
not inconsistent with the laws of the State or the United States, ... to perform the duties and to transact the business required under the provisions of [the Medical Practices Act] [N.J.S.A. 45:9-2]
Plaintiffs claim that the Board's practices and rules contravene the legislative policy of the Medical Practices Act which they claim is to eliminate the distinction between allopathic and osteopathic physicians. See Eatough v. Albano, 673 F.2d at 678, 680 (Weis, J., dissenting). As the Third Circuit pointed out in *177 Eatough, New Jersey legislative policy has been to recognize graduates of osteopathic medical schools as fully competent in every respect to practice medicine and surgery. See N.J.S.A. 45:9-5.1, 45:9-13. This contrasts with the New Jersey statutory prohibition on holders of licenses to practice osteopathy, as opposed to licensees to practice medicine and surgery, from prescribing or administering drugs and from performing surgery. N.J.S.A. 45:9-14.3. That section, while not repealed, is no longer applicable to osteopaths licensed to practice medicine and surgery. Eatough, 673 F.2d at 673, n. 2.
The Board's practice and rules do not appear to be expressly authorized by statute. See Eatough, 673 F.2d at 678-680 (Weis, J., dissenting). Thus, the question is whether the Medical Practices Act impliedly authorizes the Board's actions.
There is some statutory support demonstrating that the Legislature has decided that the public should be apprised of the educational background of the physician in determining where to receive medical treatment.
The Board points specifically to N.J.S.A. 45:9-16(j), (b), (c), (d), (e), and (g) as supporting its actions. We find the reasoning of Judge Weis more persuasive on this point, however. He wrote that the above actions of the Board were in excess of its powers and contrary to the enabling statute. Eatough, 673 F.2d at 678. He offered the following analysis:
"As the majority points out, New Jersey's present legislative policy recognizes graduates of osteopathic medical schools as fully competent in every respect to practice medicine and surgery. This legislative policy was underscored nearly two decades ago by the New Jersey Supreme Court when it discredited `the notion that doctors of osteopathy were merely cultists and may not safely be permitted to associate with doctors of medicine....' Greisman v. Newcomb Hospital, 40 N.J. 389, 403, 192 A.2d 817 (1963). The defendants conceded in the district court that `each accredited osteopathic medical school provides medical *178 education, which is equal in both substance and quality to that which is provided in a non-osteopathic medical school.'[1]
"In 1939, the legislature amended the Medical Practices Act so that `the practice of medicine and/or surgery shall be deemed to include, inter alia, the practice of osteopathy.' N.J. Stat. Ann. § 45:9-5.1 (West 1978). The Board did not respond to the legislative judgment with ungrudging acceptance. Even though its authority is restricted to the issuance of a `license ... to practice medicine and surgery,' N.J. Stat. Ann. § 45:9-16, the Board still requires that the degree designation of `M.D.' or `D.O.' be imprinted following the physician's name on each license  a practice not contemplated by the statute, or authorized by any rule.
"The Board has compounded the discredited distinction between the two types of practitioners by enforcing a `Degree Designation Rule,' N.J.A.C. 13:35-4.1, as well as an `Advertising Rule,' N.J.A.C. 13:35-6.13. The former regulation provides that `a physician licensed to practice medicine and surgery in the State of New Jersey shall identify himself only by that degree designation (M.D. or D.O.) which imprinted [sic] on the license....' Similarly, Rule 13:35-6.13, which regulates advertising and solicitation, directs that in any publication providing information to the public, the physician designate his `license degree.' Thus, the Board's licensing practice and rules perpetuate a distinction between allopathic and osteopathic physicians which the enabling statute does not authorize, and, indeed, was intended to eliminate.
"As justification for its Advertising Rule, the Board cites the provisions of a 1977 New Jersey statute, N.J. Stat. Ann. § 45:9-16, in which the legislature specified approved forms of advertising by license holders and required that their `professional *179 degree' be included in publications, listings and signs. This statute  whose constitutionality is doubtful because it restricts professional advertising, see In re R.M.J., 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (U.S. 1982) [sic]  supports a policy of requiring each licensee to disclose his `degree' to the public. Unlike the reference to `license degree' in Rule 13:35-6.13, the statute speaks of `professional degree.' Since the legislature obviously has not delegated to the Board of Medical Examiners the power to confer professional degrees  an authority vested in institutions of higher learning, N.J. Stat. Ann. § 18A:3-1 et seq. (West 1979)  it is logical to conclude that the statutory phrase `professional degree' refers to a recognized academic degree.
"Yet the Board has not observed this limitation. Foreign medical school graduates (FMGs), who have not been granted the academic degree of doctor of medicine, or who, in some cases, hold no professional academic degree at all, are issued licenses by the Board imprinted with the `M.D.' suffix.
"In defending its licensing practices for FMGs and osteopaths, the Board advances two arguments: (1) training in foreign schools is more akin to American medical schools than it is to osteopathic institutions, and (2) the public is entitled to know the background of licensees to whom it looks for health care.
"The Board's position is seriously flawed. First, in trying to fit the schooling received by FMGs into the mold of either allopathic or osteopathic disciplines, the Board exceeds its statutory authority. As noted earlier, the statute only gives the Board the power to license individuals for the practice of `medicine and surgery.' By unilaterally imposing the allopathic-osteopathic distinction on licenses issued, the Board is simply continuing the earlier invidious tradition of equating the status of a physician with an M.D. degree, a policy plainly contrary to the expressed legislative aim.
"The purported justification that the public should have accurate information about the training of the licensee is inconsistent with actual practice. The Board's policy of licensing FMGs *180 as M.D.'s, promotes deception, not disclosure, since it is conceded that many of the FMGs do not in fact hold an M.D. degree. Many foreign medical schools are of high quality, and the training their graduates receive compares favorably with that given in those American schools which award the M.D. or D.O. degree. But that is not universally true, and it is not denied that in some instances, foreign medical training does not meet American standards. Yet, under the Board's current practice, both those persons who graduate from an approved American medical school and those persons who have had foreign training  some of whom are not even graduates  receive the same `license degree.'
"The misleading nature of the designation is extended even further by the Board's rule on advertising, since it requires the physician to utilize his `license degree,'  not his `academic' or `professional' degree  on signs and in directories. Thus, the Board's practice with respect to the `license degree' conferred on FMGs does not inform the public but actually leads it to assume, erroneously, that the FMG was awarded an M.D. degree from an American medical school.[2]
....
"Since the Supreme Court of New Jersey has not been called upon to decide the issue presented here, we must predict how that court would interpret the state's Medical Practices Act. It is conceded that there is no express authority for the Board's actions, and so its defense must rely on implied power. In assessing whether a particular administrative action has statutory authorization, `the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its *181 surroundings and objectives.' New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795, 804 (1978); In re Suspension of Heller, 73 N.J. 292, 374 A.2d 1191 (1977). Any agency action is defective where it is not statutorily authorized or is arbitrary or unreasonable. 384 A.2d at 804. `[A] court is bound to override an administrative construction where it is clearly contrary to the plain meaning of the statute.' Service Armament Co. v. Hyland, 70 N.J. 550, 562, 362 A.2d 13, 19 (1976); Kingsley v. Hawthorne Fabrics, 41 N.J. 521, 197 A.2d 673 (1964). See also, Ford Motor Credit Co. v. S.E. Barnhart & Sons, Inc., 664 F.2d 377 (3d Cir.1981).
"Some indication of the New Jersey Supreme Court's view of the Medical Practices Act may be gleaned from Greisman v. Newcomb Hospital, supra, and Falcone v. Middlesex County Medical Society, 34 N.J. 582, 170 A.2d 791 (1961). In Greisman, a licensed osteopath was excluded from the staff of a private hospital because of a by-law that limited staff admission to graduates of medical schools approved by the American Medical Association. The court held that the public interest and justice required rejection of the by-law as arbitrary. 192 A.2d at 825. Similarly, in Falcone, the court struck down a county medical society requirement that denied membership to an osteopath because he had not studied at a medical school approved by the A.M.A. 170 A.2d at 799.
"These two cases demonstrate that the New Jersey Supreme Court has an overall commitment to the non-discrimination policy adopted in the Medical Practices Act. It appears to me, therefore, that the court would be strongly disposed to strike down the discriminatory licensing policy that the Board has pursued with respect to osteopaths and FMGs." [673 F.2d at 678-680]
We conclude that the Board has exceeded its statutory powers in undertaking to place a degree designation of M.D. and/or D.O. on all licenses to practice medicine and surgery in *182 New Jersey and in adopting N.J.A.C. 13:35-4.1 and 13:35-6.13 since there is no statutory basis for the regulations.

III
Plaintiffs also argue that the Board's licensing scheme violates the equal protection clause of the Fourteenth Amendment and the New Jersey Constitution.
We address the plaintiffs' federal claim first. Plaintiffs argue that the Medical Practices Act contemplates the same plenary license for all qualified physicians, see N.J.S.A. 45:9-12, and makes no distinction between graduates of allopathic medical schools and osteopathic medical schools for licensing purposes. Plaintiffs argue that the Board has arbitrarily chosen on its own to create two classes of physicians with respect to issuing licenses, M.D.'s and D.O.'s, in furtherance of no legitimate state interest. Plaintiffs also contend that the Board's policy of issuing M.D. licenses to FMGs (and thus allowing them to hold themselves out as M.D.'s) arbitrarily favors FMGs over holders of D.O. degrees. Plaintiffs also assert that the Board's practice of issuing licenses to a limited class of D.O.'s (those California osteopathic medical school graduates who were conferred an M.D. degree) with the inscription "D.O., M.D." has no rational relation to any state interest.
Plaintiffs recognize that their federal equal protection claim is measured by whether the Board's practice of classifying physicians as "M.D.'s" or "D.O.'s" or "D.O., M.D.'s" bears "a rational relation to a legitimate state interest." Ohio Bureau of Employment Serv. v. Hodory, 431 U.S. 471, 489, 97 S.Ct. 1898, 1908, 52 L.Ed.2d 513 (1977). See Eatough, 673 F.2d at 676; Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249 (1976), appeal dismissed and cert. den. 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977), opinion republished 80 N.J. 6, (1976). We find the Third Circuit's reasoning on this issue to be persuasive and find no federal equal protection violation. See Eatough, 673 F.2d at 676-678. We also note that the Board's *183 policy of issuing "D.O., M.D." licenses to the small group of California "graduates" is rationally related to the purpose of allowing the public to make an informed choice among physicians in that it informs patients that those physicians have had osteopathic training and since the parties agree that some patients seek out D.O.'s precisely in order to obtain the manipulative treatment such physicians ordinarily offer. See Eatough, 673 F.2d at 677, n. 5.
Plaintiffs argue that the Board's licensing practices are a violation of the equal protection provisions of the New Jersey Constitution. "The state standard for equal protection `parallels that under the federal Constitution.'" U.S.A. Chamber of Commerce v. State, 89 N.J. 131, 159 (1982) (quoting Levine v. Institutions and Agencies Dep't of N.J., 84 N.J. 234, 257 (1980)). Thus, the rational relation criterion is used to test this "ordinary social and economic regulation." Eatough, 673 F.2d at 676; see U.S.A. Chamber of Commerce v. State, 89 N.J. at 158-159. Plaintiffs argue that a stricter standard applies  that there must be a real and substantial relationship between the legislative classification and the governmental purpose which it purportedly serves. They cite to Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., supra, 71 N.J. 249. That standard corresponds to the intermediate "level" scrutiny applied to federal equal protection claims. See U.S.A. Chamber of Commerce v. State, 89 N.J. at 158. The court in Weymouth, however, was considering an "important personal right"  "the right to decent housing." The court noted that they had accorded a preferred status to that right under our State Constitution. Weymouth, 80 N.J. at 43-44. Applying the rational relation test in this case we find that there has been no state constitutional equal protection violation as a result of the Board's licensing scheme. See U.S.A. Chamber of Commerce v. State, 89 N.J. at 159.
Plaintiffs also argue that the licensing scheme denies certain members of the public health care. There is little or no support in the record for this contention.

*184 IV
Plaintiffs next contend that N.J.S.A. 45:9-16 and N.J.A.C. 13:35-4.1 and 13:35-6.13 deprive plaintiffs of their liberties under the First Amendment to the federal Constitution and N.J. Const., Art. 1, ¶ 6.
Plaintiffs first attack the Degree Designation Rule, N.J.A.C. 13:35-4.1 which prevents plaintiffs from identifying themselves by the letters "M.D." The thrust of plaintiffs' argument is that "M.D." is a generic term for "medical doctor, doctor, physician or other similar variations." They argue that the public believes "M.D." is an occupational designation rather than just a degree designation and that the Board's refusal to allow the plaintiff physicians to use the M.D. designation is a form of professional jealousy. Plaintiffs assert that they are denied their right to freedom of expression. Alternatively, plaintiffs assert that they cannot be compelled to "speak" in a way so as to attribute to themselves a belief or philosophy they do not embrace. None of the plaintiffs use osteopathic principles in their practice but must identify themselves by the letters "D.O."
Plaintiffs rely heavily on the results of a professional survey which they had done which demonstrates that 91% of all the consumers surveyed identify the initials "M.D." as signifying an occupational designation. The Board has, incidentally, claimed that the above survey is not properly before this court as evidence.
Plaintiff Eatough made this argument to the federal district court and Judge Lacey rejected it. He relied on the reasoning of the court in Oliver v. Morton, 361 F. Supp. 1262 (N.D.Ga. 1973) (three-judge court). See Maceluch v. Wysong, 680 F.2d 1062 (5 Cir.1982) (holding that osteopaths' First Amendment rights were not violated by Texas licensing scheme which prevented them from using designation "M.D." after their names on their letterheads and on other public listings of diverse nature, although osteopaths contended designation "M.D." was allegedly of a generic nature). We find, as did Judge Lacey, *185 that N.J.A.C. 13:35-4.1 does not violate plaintiffs' First Amendment rights. Plaintiffs have cited us to no case law which indicates that this issue should be determined differently under the New Jersey Constitution.
Plaintiffs next attack the Advertising Rule, N.J.A.C. 13:35-6.13 and N.J.S.A. 45:9-16 as violative of their right to freedom of expression under the federal and state constitutions. They wish to be permitted to advertise on the electronic media, in the white and yellow pages of the telephone directory, and by direct mail. They assert that their advertised information would include descriptions of their medical services, photocopies of specialist certificates, and prices of routine services (e.g., electrocardiograms, stress tests, diabetes tests, etc.).
Plaintiffs claim that the above statute and rule are too restrictive of their "commercial speech." Plaintiffs attack the rule as more expansive than the underlying statute permits. They argue that the Advertising Rule is an invalid attempt at a "saving construction" of N.J.S.A. 45:9-16. Plaintiffs rely on a series of recent United States Supreme Court decisions.
It should be noted that these plaintiffs have never attempted to advertise in any way not permitted by statute or rule except for holding themselves out as M.D.'s rather than D.O.'s which is clearly not permitted by N.J.A.C. 13:35-6.13. The Board has only threatened disciplinary action for that reason. Plaintiffs contend that the statute and rule are overbroad and vague. They object to the rule's restriction that advertising be "in a dignified manner in newspapers or comparable written publications...." N.J.A.C. 13:35-6.13. They object to the statute's restriction that direct mail advertising be limited to "patients of record." N.J.S.A. 45:9-16(f). They also want to advertise their specialist certificates, some of which have the designation M.D. imprinted on them, and to advertise on the electronic media.
We find that plaintiffs' overbreadth challenge should fail and that we should concern ourselves with the actual conduct engaged *186 in by the plaintiffs. In Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Supreme Court refused to apply the overbreadth doctrine to professional advertising, stating:
In the usual case involving a restraint on speech, a showing that the challenged rule served unconstitutionally to suppress speech would end our analysis. In the First Amendment context, the court has permitted attacks on overly broad statutes without requiring that the person making the attack demonstrate that in fact his specific conduct was protected. See, e.g., Bigelow v. Virginia, 421 U.S. [809], at 815-816, 95 S.Ct. [2222], at 2229 [44 L.Ed.2d 600 (1975)]; Gooding v. Wilson, 405 U.S. 518, 521-522, 92 S.Ct. 1103, 1105-1106, 31 L.Ed.2d 408 (1972); Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965). Having shown that the disciplinary rule interferes with protected speech, appellants ordinarily could expect to benefit regardless of the nature of their acts.
The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. See, e.g., Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973); United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960), Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The reason for the special rule in First Amendment cases is apparent: An overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute. See NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.
But the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context. As was acknowledged in Virginia Pharmacy Board v. Virginia Consumer Council, 425 U.S. [748], at 771 n. 24, 96 S.Ct. [1817], at 1830 [48 L.Ed.2d 346 (1976)], there are "commonsense differences" between commercial speech and other varieties. See also id., at 775-781, 96 S.Ct., at 1832-1835 (concurring opinion). Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. See id., at 771-772 n. 24, 96 S.Ct., at 1830-1831. Moreover, concerns for uncertainty in determining the scope of protection are reduced; the advertiser seeks to disseminate information about a product or service that he provides, and presumably he can determine more readily than others whether his speech is truthful and protected. Ibid. Since overbreadth has been described by this Court as "strong medicine," which "has been employed ... sparingly and only as a last resort," Broadrick v. Oklahoma, 413 U.S., at 613, 93 S.Ct., at 2916, we decline to apply it to *187 professional advertising, a context where it is not necessary to further its intended objective. Cf. Bigelow v. Virginia, 421 U.S., at 817-818, 95 S.Ct., at 2230. [433 U.S. at 379-381, 97 S.Ct. at 2706-2708]
In N.J. Bd. of Higher Ed. v. Shelton College, 90 N.J. 470 (1982), Shelton College challenged certain New Jersey statutes and regulations as violative of the Establishment Clause of the First Amendment. Shelton claimed that the statutes should be invalidated because they were amenable to an unconstitutional application. The court declined to so hold stating:
It has not been the Court's practice in considering facial challenges to statutes of this kind, to strike them down in anticipation that particular applications may result in unconstitutional [action]. [90 N.J. at 490, citing Roemer v. Maryland Public Works Bd., 426 U.S. 736, 761, 96 S.Ct. 2337, 2351, 49 L.Ed.2d 179 (1976)]
We do not find that N.J.A.C. 13:35-6.13 or N.J.S.A. 45:9-16 is violative of the federal or state constitutional guarantees of free speech because of its potential for over-regulation. We note also that Judge Lacey reached the same conclusion in plaintiff Eatough's action in the federal district court.
With respect to plaintiffs holding themselves out as M.D.'s and the prohibition of same by N.J.A.C. 13:35-6.13, we cannot conclude that plaintiffs' federal or state constitutional rights have been violated by that provision. To the extent that none of the plaintiffs has earned the M.D. degree and since M.D. is not a generic term for physician, such conduct by the plaintiffs is misleading and properly regulated by the Board. In In re R.M.J., 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), the Supreme Court said:
Commercial speech doctrine, in the context of advertising for professional services, may be summarized generally as follows: Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proven that in fact such advertising is subject to abuse, the states may impose appropriate restrictions. Misleading advertising may be prohibited entirely. [455 U.S. at 203, 102 S.Ct. at 937]
We conclude that neither N.J.S.A. 45:9-16 nor N.J.A.C. 13:35-6.13 violates the federal or state constitutions in the context of this case.
*188 Plaintiffs also make constitutional challenges to those provisions based on the public's right to receive information and plaintiffs' right to refrain from speaking. Those arguments are adequately answered by our discussion above.

V
We hold the Degree Designation Rule, N.J.A.C. 13:35-4.1, and the Advertising Rule, N.J.A.C. 13:35-6.13 invalid as outside the authority given to the Board under the Medical Practices Act. We find no federal or state equal protection or free expression constitutional violations. Accordingly, we enjoin the Board from inscribing a degree designation of M.D. or D.O. on the license issued to practice medicine and surgery in New Jersey.
No costs.
NOTES
[1] The district court observed, "the New Jersey College of Osteopathic Medicine and the New Jersey College of Medicine share the same facilities for instruction in the basic sciences during the first two years. They share the same rooms, labs, and instructors, and the examinations are the same."
[2] The record shows that two patients left Dr. Eatough because he had a D.O. degree, rather than an "M.D." designation. Clearly, then, he suffers harm under the board's policy because a member of the public might be led to consult an FMG whose training was inferior, but who is permitted  indeed required  to designate himself as an "M.D."